I'd like to focus on two issues in this appeal. The first is the extension of the detention in order to wait for the arrival of the drug-sniffing dog, and the second is the admission of substantive evidence of the drug courier profile opinions of the police officer. This case, unlike most of the cases cited by the parties, has an unusual fact situation, and that is that the police officer admitted that 13-year-old after he had stopped, and in fact the magistrate judge found that 13 minutes after he had stopped Mr. Ceja-Garcia, he had everything he needed for the traffic citation, and in fact, when Trooper Martin showed up, the citation was being written out at that time, which is at 1.18 a.m. Twenty minutes later, the citation was handed to Mr. Ceja-Garcia. The evidence is clear in this record that there was no evidence of the drug-sniffing dog, and that there was no evidence of the drug-sniffing dog. There was no further investigation being done with regard to either the traffic violation or anything else. So is your supposition, I think an inference from the facts here, that the canine unit was just slow in getting there and the officer was stalling, waiting for the dog? Actually, you don't have to make that supposition. The officer testified that the only reason that he was detaining Mr. Ceja-Garcia at that point was to wait for the canine. The only reason he was detaining him at that point. Now, so unlike many of the other cases where there's either the canine shows up at the time that you're still doing the traffic violation investigation, or the canine shows up while you're still asking questions and trying to determine if there are issues with regard to the registration, none of that was going on while this delay was occurring. None of that was going on, along with the fact that the trooper admitted that that was the only reason he was being detained. They didn't even believe, Your Honors, that they were detaining him based upon reasonable suspicion. And the reason that we know that is that when they finally decided that they were ready to do the search, and let me back up just a second. Trooper Martin said the only reason he was there and he was called within minutes of the stop was to do a search. The canine was called within minutes of the stop. That was for the search. So the whole extension of that period of time is in order to wait for the canine to get there so they can conduct the search. Is that what he said? Is that what he testified to? My understanding was that because it was a suspected driving under the influence stop, that they sent a backup officer for that reason. Trooper Martin said at EOR 135, I was there to search the vehicle. That was his testimony. So the reason that you know that it wasn't that they were now extending for further investigation on the drug amount was that they let him go. They weren't detaining him. Because the minute that they had the citation, they had it for 20 minutes at that point, according to the magistrate judge and according to the cop. And so when they decided they were getting ready to search, they wanted to try to, in accordance with their instructions, when you want to do a search, this is how you do it, you then let the guy go and you say you're free to go. Trooper Hagstrom said he could have walked off at that point. So he clearly wasn't being detained at that point based on reasonable suspicion. And they do that as a ploy, in our opinion, in order to be able to make it appear that there's consent. So you have the 20 minutes. This is the issue that was left out in Illinois v. Cabayes, the issue that they did not decide in Illinois v. Cabayes. And Illinois v. Cabayes, as the Court will recall, the holding was, is that the dog sniff is not a search. So if they were really detaining him based on reasonable suspicion, which is what the government would like to leave you to believe, they didn't need to let him go. They know they didn't have reasonable suspicion on him, so that's why they did that. All they would have to do is run the dog around the car, and if the dog alerted, and they were able to support the detention at that point based on reasonable suspicion, then that's all they would have needed to do. Go ahead. What do we do with the factual determination of consent and voluntariness? As I understand the record, as soon as the trooper told the defendant, you know, here's your ticket, you're now free to go, as he started to walk away, it was sort of, oh, excuse me, you know, can I ask you a couple more questions? Have you got any drugs in the car? Would you mind searching? And then we've got a factual finding that that written consent was knowingly and voluntarily given. The issue that the government did not address in its answering brief, but which was raised in the opening brief, was the fact that the consent was tainted by the illegal detention. And so because the magistrate judge found that there was no illegal detention, the magistrate judge didn't reach that issue of the consent being tainted by the illegal detention. So the government had the obligation and the burden to prove that that was attenuated somehow, that the consent was somehow separate based upon timing, based upon the circumstances, that somehow the Fourth Amendment violation didn't taint the consent. The police stopped Mr. Ceja Garcia for crossing the line. And within minutes of the stop, the officer has called for, specifically called for a canine unit. Right. Now, did he have reasonable suspicion to request the canine unit? At that point, all he had were these very, at least what he testified to, is he had, he didn't want to look me in the eye. He saw the air fresheners, and he was suspicious about the length of the trip. Does somebody go from Chicago to Los Angeles? A couple more things. Well, he had the Illinois plates and a California driver's license. And no registration, right? No. And, yes, he couldn't find the registration in the car. Right. So he had no registration. He had Illinois plates. He gave a suspicious relation of his trip. He didn't look him in the eye. He had been going over the line, and he had the strong smell of air fresheners, which, from experience, is used to cover over the smell of drugs. Right. That's what he had. None of that amounts to reasonable suspicion upon which to detain him. We cited a number of cases in which that constitutes a hunch, not reasonable suspicion. What do you do with Rojas Millon? The case was not cited by either party. It's a 2000 decision by our court in which we have people, officers in Reno, stopping somebody. He tells them that he's making a quick trip to Reno and going back to Stockton. The officer is suspicious about the short time frame, and he's got the strong odor of perfume emanating from its interior, which, based on his training, suggested that the driver might be masking the smell of illegal drugs. We found that that was sufficient. Well, I guess the question is, was that sufficient to call the canine dog? What I'm saying to you, Your Honor, is that we know that's not what they were doing because they let him go. They weren't detaining him based upon reasonable suspicion. Okay. Post the time they were investigating the traffic ticket. Okay. Aside from the, let's suppose that this was sort of a ruse to let him go. Did they have reasonable suspicion to call in the canine unit, and could they have held him pending the arrival of the canine unit? I don't believe the factors are sufficient, Judge, not in this case. They knew that they had a valid California driver's license, although he couldn't find the registration. That isn't a basis for calling in a drug dog. That isn't a basis for doing the search. They knew it wasn't. Okay. What about the air fresheners? Well, the air fresheners, both the DEA agent as well as the trooper Hagstrom testified that air fresheners are not uncommon in vehicles. But three does seem like a little overkill, doesn't it? Unless this was a really smelly car. Well, I mean, if this Court were to find that simply having air fresheners, three air fresheners in a car is sufficient. Well, that combined with the fact that the guy was from Chicago, had been to L.A. for one day, and had turned around and was driving right back to Chicago. And that's very – again, that's Rojas, Millon, where we're only running between Reno and Stockton, but the 200-mile round trip, I'm only here for a little while and turning right around and going back, were the two factors that our Court relied upon in Rojas. I agree, except I have to say that in this case what you have is an admission by the trooper that he had completed everything with regard to the traffic stop at 118. And I think an admission by conduct when they said, no, we're not detaining you, when he said, no, he could walk away, no, we're not detaining you based on reasonable suspicion in order to be able to search this car. They must have been saying that when they said to him, you're free to go. If they weren't saying that, Judge, then what they did was they were basically coercing him into consent, and then we fall right into the consent issue, which was the basis for that search. It's either one or the other. He was either free to go because they didn't have reasonable suspicion to hold him, or the consent was involuntary. It can't be both. It can't be both. They've got to pick with what they're doing, and they did not want to hold him based upon reasonable suspicion. In fact, the trooper explicitly said, what would have happened if he had turned away and wanted to drive away at the point that they handed him the ticket? He was asked that specific question. He said, we would have let him go. It happens many times. So obviously they were not detaining him based upon reasonable suspicion. Either that or the other argument that we have in the brief is that it was simply a ruse in order to be able to coerce him into consent. I'm still struck by the fact of the time lapse between when he called for the canine and when the canine actually arrived. And why isn't the answer to your speculation just as likely that the trooper was running out of time, the canine unit still wasn't there, he didn't feel he had enough to make an arrest, he needed a canine alert at that point, the dog hadn't shown up, he delayed the issuance of the citation as long as he could, and just about at the point where he thought he'd run out of time, he hands the ticket to the guy and maybe he's going to follow him down the road if the canine ever gets there and stops him again. I don't know. The facts don't reveal that, however, because the canine unit arrived at, I think I have it in the opening brief. The canine unit arrived at 122. The citation was handed to Mr. Garcia at 136. The consent form for search was signed at 138. So the canine unit was already there. The canine unit had been there since 122. And this was all confirmed by the computer. So the dog and the three cop cars at this point, the canine unit, are all standing there. I don't know whether they're organizing, getting ready to do the search, who knows what they're doing at that point. Trooper Martin was asked that question. He said, I have no idea what anybody was doing. I don't have any idea. Learning Spanish, possibly, I have no idea. So we have a 15-minute delay between the time that the canine unit arrives at 122 or 123 and the time that he signs the consent form. So the canine isn't even deployed until after he's already been there at least 15 minutes. That's correct. That's correct. That's correct. And what was the evidence regarding coercion in signing the form? What we gave this court is the training sheet from the troopers saying, I want to search the car. Now what do I do? And so the coercion is the ruse that you are somehow free to go when really the circumstances are such that you are not. I was really curious. I commend your creativity in putting that in the record. Was the trooper confronted with that? He was not. He was not. I'm not quite sure what to do with that on the record. Look at what they're telling these folks. It is. And it was introduced with another trooper from the Nevada Highway Patrol in the related case that's cited in the brief. So what do we do? I'm sorry. I'm not quite sure what to do with that on the record of this case. I understand what you're trying to do, but can we fairly attribute to these troopers without any foundation? Probably not. Okay. Probably not. Getting back to my question, and perhaps I'm a little slow this morning, but you are free to go is a predicate for coercion as to signing the release, right? Explain that to me. Yes. It does seem counterintuitive. Does it lose something when said in Spanish? Well, nobody was talking in Spanish at all except for Mr. Ceja Garcia. So everyone else was speaking English. Although the form, as I understand it, was in Spanish. Apparently the form that he pointed to has a Spanish. You are free to go. And then they say would you kind of. They're trained to do this, Judge, is what they do is they say, here are your keys, here's your citation, you can go. And they say, oh, I have a few more questions. So that while you're, after having stood on the side of the highway for 40 minutes. Like the gentleman with the raincoat, Beretta, who said, can I ask another question? Actually, I had forgotten about that, but that's exactly right. I do remember that now. Coercion, right? It's a ruse to make the person feel that they're actually free to go when, indeed, they're standing on the side of a highway, there's a canine behind them, there are three cop cars, and it's done in order so that they can make you think that the person is free to go by using those words. What if they said you're not free to go? Would that be coercion? Well, then he'd be in detention and the consent would be involuntary. Right, right. So there is a difference. And when you say you are free to go, it is coercion nonetheless. That's our theory. So whether you let him go or whether you don't let him go, any significant difference. They weren't going to let him go, I guess is our point. The assumption that they procured is one of coercion under your theory, right? Under our theory, using this ruse, yes. If, in fact, it was a ruse, let's suppose that it's a ruse, then he's really not free to go. Now, if there is reasonable suspicion, then does the fact of reasonable suspicion sort of moot the statement of you're free to go? In other words, does it moot the ruse? Well, if he really was detained at that point, I mean, that's the curious nature of these particular facts, is if he was really detained at that point, if the government's theory is that they had reasonable suspicion to detain him that 30 or 23 minutes at that point, and that's what they were doing, was they were detaining him based on reasonable suspicion, okay, then he was in detention when the consent was signed. If instead what they're saying is, no, he wasn't, they really weren't detaining him based on reasonable suspicion or they were and they just decided to not detain him at the point at which they were getting ready to search, which doesn't make much sense, then I think they have to make a choice. Is it either reasonable suspicion that caused them to detain him or or? Let's talk about that. In light of the Supreme Court's decision, is it Delaware v. Prouse that talked about we don't really care what the motivation is for the trooper in making the stop, but we look at the reasonableness that underlies the suspicion to determine whether further delusion of security. Yes, an objective as opposed to a subjective test with regard to whether or not they could have had reasonable suspicion based upon these facts. Okay. And I haven't read that case recently, but it seems to me that the Supreme Court in deciding Delaware v. Prouse at least impliedly rejected the distinction that you're trying to draw, that we parse these street encounters so finely that if we find that the justification for the initial stop was over because the citation was completed, at that point the officer has to let the defendant go, even though we might rule as a matter of law that the facts the officer articulated amounts to reasonable suspicion to justify further investigation. I think the issue here is whether or not the facts are such that you can convert within five minutes of the stop a traffic stop for a relatively minor traffic offense into a full-scale drug search operation, which is what happened here. Well, you know, that decision that we wrote in Murillo or Murillo, however you pronounce it, certainly comes close to that. I mean, the initial stop by the highway patrol officer was following too closely. But then based on what he observed and the defendant's nervousness and so on. Well, Murillo was one. As I recall, though, the defendant's nervousness was not what it was here, which was just he didn't want to look in my eyes, although Trooper Martin said he was overly friendly. But the nervousness in Murillo was shaking and it was insane. Yeah, but the traffic officer said in 10 years as a traffic officer. He'd never seen anything like that. And he actually took his pulse. Right, he even took his pulse. That's correct. 150 beats a minute or whatever it was. But I guess my question is, would you agree that on the facts of Murillo that what may have been initially simply a routine vehicle code, traffic stop for following too closely, quickly broadened into reasonable suspicion to believe that this guy might have drugged him? Well, you know my answer is going to be no, I don't. Because I just, under the facts of this case. He said yes in Murillo, didn't he? Murillo's facts were different than the facts in this case. The difference between somebody being stopped, and I certainly have been in that position, not wanting to look into the eyes of the trooper is a lot different than somebody whose pulse you're taking because they're so nervous. The other factors are all factors that would apply to any number of innocent travelers. I have very little. I had those factors, too. I mean, the guy, you know, was on a long cross-country trip. He'd rented a car down in Santa Ana, and he was going to Yakima. And he couldn't really explain who he was going to go see in Yakima. I think we had some conflicting, there were conflicting answers that he had. And none of that happened here. They didn't proceed along with questions like that of Mr. Ceja Garcia. There were no two passengers, which you see a lot, giving different stories about where they were going and where they'd been and why they were in those places. It was a single occupant stop. But I think that with Mr. Murillo, as I recall, he couldn't give addresses. He couldn't. Those questions weren't asked of Mr. Ceja Garcia. They didn't ask what his sister's address was or where he had been in L.A. They didn't ask any of those questions. They were intent on making a search from the minute that that car was stopped, is how the facts at least appear to me. I have less than a minute left. All right. Let's hear from Mr. Getz. Mr. Getz, you're next.  I'm going to meet with Mr. Ray Gatinella. Good morning. Ray Gatinella, assistant United States attorney from the District of Nevada. Your Honor, to get right into the scope of the detention, which seems to be the main argument the defense is making here, I believe it was mentioned that the stop occurred, and this is also in the report and recommendation by the magistrate, that the stop occurred at 1.03 and that the magistrate found that at 1.16 the officer had enough information to write a citation. And then another 20 minutes passes, and it was at 1.36 that the defendant signed the consent to search. So the real issue is whether or not within that 20-minute period of time this officer had reasonable suspicion to believe that some criminal activity was afoot. And the defendant would have the court believe that there was nothing that was occurring, no other investigative techniques or anything was going on at that time. And I would submit to the court that if you look at the report and recommendation that there were, because at 1.18 is when Trooper Martin arrived, and what Trooper Martin did is that he walked up and he started to converse with the defendant, okay, and he asked the defendant about his travel plans, where he had been. He also looked inside the car. He noticed the location of the green air fresheners that were there. So there were some other activity that was occurring during that time. It is true that the K-9 officer arrived at 1.23, and it was approximately 13 minutes from that point in time to the point in time to which the defendant signed the consent to search. And the magistrate in the district court accepted those findings. In its report and recommendation, it found that there was reasonable suspicion, and it pointed to five factors that it took into consideration. One was the nervousness, the fact the defendant didn't make eye contact with him. Two, the air fresheners. And what was important to the magistrate with regard to the air fresheners was the number of air fresheners, the location, and the overwhelming odor that was coming from them. Apparently, there were three air fresheners on the passenger side of the car. And based on that officer's training and experience, he found that to be odd. He had been taught that there are times when air fresheners can be used to mask the odor of illicit drugs. Furthermore ---- And this trooper had previously been a member of the Highway Patrol Drug Interdiction Task Force. Yes. So he had some experience in narcotics cases. Yes, that's correct, Your Honor. He did have training in that regard. And also, I would point out that the officer also ---- the magistrate court found another important factor, and that was the travel plans, the fact that he said he was going from Chicago to Long Beach and then he was going back. It was not consistent with the average traveling motoring public. And furthermore, what also drew his suspicions was that the car had Illinois license plates and the defendant had a California driver's license. He thought that was unusual. And also, it was registered to an absent third party. As it turned out at trial, it did come out that the defendant did in fact register this vehicle. However, the computer had not caught up with the defendant. But nonetheless, at the time of that particular stop, the officer believed or the trooper believed that it was an absent third party. So the district ---- the trial court found that those factors were sufficient to justify that 20-minute period of time for which the defendant was detained. So why didn't they just go ahead with the search? Why did they tell him that he was free to go if he really wasn't free to go? Okay. Well, the position the government has at 136 when he issued him the citation, at that point, the investigation, everything that the officers had learned at that time did not ---- the officers did not feel they had probable cause right then to arrest him and search the car. At that point in time, they did everything they could with regard to their investigation. They had reasonable suspicion to detain him for that period of time. But after that, they felt they did not ---- they did not have the authority to automatically search that vehicle. So they did what they had to do. They didn't have the authority to search in their minds. So then they give him the citation and they tell him he's free to go. And it was not a ruse because the officer testified that had the defendant said no or did not ---- had the defendant not consented to this search, they would have let him go. And they said they did. They followed him down the road, right? Well, they did testify that they have let a lot of people go that do not refuse to consent to search. So they are there complying with, you know, Chavez-Valenzuela, which basically stood for the proposition that there has to be some type of a break from the detention to the point in time when the encounter becomes consensual. And that break was when he handed him his driver's license back, issued him the citation, told the defendant he was free to leave, and the defendant turned around and started walking. At what point did they tell him he's free to go? Is that close to 136 when he signs the consent? Yes, Your Honor. Yes, Your Honor. Is it much closer than the 116 when everything is complete for issuing the citation? Correct. Is the citation written up by 116? No, it is not, Your Honor. I believe the master court did say that he had enough information at that time to write the citation, but it was not written up at that time. In your view, what you have to justify then is the 20 minutes between 116 and 136. Correct. Okay. And what's the justification for that? The justification is those five factors that the magistrate court has introduced. Okay. And that's just enough to hold him for that long, but not enough to bring the dog into the car? Not enough to do a full, full-blown search, no, Your Honor. And do you agree that in order to get the dog in the car, they would have had to have probable cause? To get the dog inside the car, yes, Your Honor. To circle the outside of the car. Reasonable suspicion or probable cause? To get the dog in the car, probable cause. Okay. Just to hold him there, they have to have reasonable suspicion, though. Correct. Had the dog been walked around the exterior of the car? That's an interesting point, Your Honor. In the reporting recommendation and at the motion to suppress, the testimony was that the dog circled the car. To be fair, at trial, it came out when that canine handler was brought in and testified, he testified that the dog circled the car, did not alert, but then went inside the car. And clearly, the act of going inside the car is a search at that point. But that didn't occur until after the 20 minutes. Until after the 20 minutes, until after the defendant signed the consent to search. Yes, Your Honor. It's the government's position that the detention stopped at 136 and the encounter became consensual. And that there was, you know, when we apply, when we're referring to the consent to search form, when we apply the Castillo factors there, you know, the defendant was not in custody, none of the officers had any guns that were drawn. The canine unit and the other officer were in the back. With regard to reading Miranda warnings, were they required? No, because he was not under arrest. He was advised that he had the right not to consent. In fact, on the consent to search form, it said that. And it was written both in English and Spanish. And, in fact, he actually went down with his hand when he was reading the Spanish portion of the consent to search. I don't think, as I understood Ms. Forsman's argument, I don't think she's challenging that if you can get beyond the taint issue, which is what we're concerned about here, that there's anything otherwise wrong with the consent form itself. As I understood her argument, it's the taint that invalidates no matter what the form said. In essence, they didn't have a right to ask him for consent at that point, that they should have just let him go. Well, they did let him go, Your Honor, by telling him he was free to leave. Well, then 30 seconds later said, you know, Colombo-like, just one more question here, Mr. Sayhucker. Do you have any drugs, want to consent to a search of your car? And I believe, Your Honor, that the case law is clear that a police officer is free to converse consensually with another individual on the street, wherever it may be, just the same way that any other citizen would be able to talk to an individual. And if that person wishes to talk to the officer, he may, or the person may also choose not to and be on their way. And I believe the officer was clear that in this case, had he decided not to consent, he would have let the defendant go. Let's see. And also I will point out the lower court did find at the motion to suppress hearing that there was no evidence that this trooper was dilatory in any of its detention or in the investigative detention, with regard to the traffic stop or with regard to the detention due to the suspicion of the traffic stop. So, Your Honor, for those reasons, we'd ask the Court would sustain and affirm the lower court's determination on that issue. All right. Thank you. Your Honors, and I don't know if more time you would want to afford to the government to respond to this, but there's another extremely serious issue in this case that I didn't have time to address, and I would just urge the Court to look at the drug profiler or the drug courier profile evidence that was admitted. In our reply brief, we've detailed exactly what was done both during the examination to the witnesses as well as in the final argument in which the opinion of the police officer is given repeatedly that these things indicate drug courier. That practice has been condemned by this Court and by many other courts, and I think that requires a new trial on that issue alone. Before you – I thought that you – that point was well briefed, and we do have what appears to be sort of two lines of cases, depending on whether we're talking about profile as opposed to modus operandi evidence. I think we understand that. I would like to ask you, though, going back to the taint issue, we really do have to find, don't we, that the – that the so-called release of Mr. Ceja Garcia was just a complete ruse and – in order to buy the argument that the taint continued and invalidates the consent. No, I don't – I don't agree with that. The only issue that was analyzed by the magistrate judge or by the government in their brief was whether or not the consent was voluntary without any consideration of there being a Fourth Amendment violation. The timing of the – of the request for consent, all of those matters simply have never been considered by the Court because it didn't reach that issue. So would we have to, what, reverse and remand for a – I guess we'd have to vacate the conviction and reverse and remand for, what, a continued hearing? If you were to find that the – that the detention was unlawful because it was not supported by reasonable suspicion or because of the fact that they let him go, they really weren't basing it on reasonable suspicion, then I think you would have to reverse on that – on that ground. All right. Thank you. Thank you, Your Honors. Thank you both. The case was very well argued and it is submitted for decision. Do you want to take a break or do you want to come? Do you need a break? No, no. Do you want to take a break? Okay. We'll take about a 10-minute recess before we hear argument in United States v. Justice. Thank you.
judges: Tallman, Bybee, Bea